Case number 11-3028 in the Interest of Rico L, a minor. Okay, would the lawyers please approach and introduce yourselves to the court. Those who are going to argue the case. Good morning, Your Honor. Diane Redleaf on behalf of Bernadine L. Good morning. Assistant State's Attorney Nancy Kosicki on behalf of the people. Good morning. Jean Agathon, Assistant Public Guardian on behalf of Rico. Have you guys worked out how you're going to divide this up? Yes. Okay, and you're going to reserve some time? Yes, Judge, five minutes. Okay. You understand, Judge Palmer is not here, but he will listen to the tapes, okay? And he will be in our process. Thank you, Your Honor. You may proceed. Because we have so many cases, we're going to have to hold you to the time limit of 15 minutes. Will you notify me when I'm getting close? Well. I see there's no light. No, there's no little light or anything, but I'll stop you at the button. Okay, very good, Your Honor. May I proceed? May it please the Court, my name is Diane Redleaf and I represent the appellant Bernadine Long. I'm sorry, Bernadine L. On September 27, 2011, Rico L. had been in the hospital for 28 days. We have the facts and we're well acquainted with them, and I understand that you're challenging what the circuit court judge did in this case. Absolutely. And the question is, what should the judge have done instead, given that it seems like everyone was at their wit's end to help Rico and help Bernadine in being able to live together? Well, the posture of the case is important because it wasn't set for a change of dispositional order. It was set for a status hearing and there was no emergency. So the first thing that the judge should have done is to take the status report. Well, let's narrow the date on which you're claiming that's simply for status. What date are you saying? On September 27, it had been set for status, and the issue was before the court as to whether he was going to close the case. And where was Rico on September 27? He was in the hospital. And there was no discharge plan. There was no discharge date. There were no recommendations that had been tendered. There were no doctor's reports. There was no information before the judge as to what the recommended disposition was, and, in fact, the only recommendation that was in front of the court as to what the hospital thought should happen was that he should go home when he was ready. And, in fact, the DCFS. And there were other individuals there that said, we can hardly enter an order directing that Rico go home without first getting a discharge report from the hospital where he's currently staying. Well, that should have been requested because that wasn't before the court in either direction in terms of keeping him and having him go to DCFS, and there was no plan for if he did go to DCFS, what would be the... So let's back up a little bit. Sure. Because he's at home because of an order that was entered in June. Correct. And in June, I think the judge made it very clear that if the conditions for his being at home weren't able to be met, that certain consequences would follow. And I think why isn't that simply sufficient to allow the judge to act the way he did on September 27th, given that his conclusion was that that was in the best interest of Rico? If there had been a violation... It's a recording device. I'm sorry. I'm sorry. Okay. Your Honor, if there had been a concern about a violation of a protective order under which Rico was returned home, this court in the PP case has said there should be a motion for a violation and a hearing on that. In the context of what? In the context of a claim that the child cannot remain in the home. Well, don't forget, this is not an order of protection in that sense. This is a different type of order. It's a supervision order. Correct. Placing the parent under the supervision of the probation department to make sure that certain conditions are followed. So it isn't the sort of protection order that you're referring to. So there's no violation of it. The court is simply informed whether or not the conditions have been complied with. So given there's no violation, Your Honor, to change a disposition, which is what the court did, we're not saying he couldn't have made an emergency order. We're not saying he couldn't have made a temporary order to have Rico stay in the hospital until he could get a report. That's not our position. Our position is that would have been a reasonable way to proceed if there was concern. So now that we're at the point where we're at, what's the remedy? The remedy, Your Honor, is to reverse the finding of unable. How does that rectify what you say was the incorrect procedure when the underlying facts, those that put Rico in the hospital, those that led to the blowup in August at the home, how does going back for, you know, these procedural steps to be taken help anyone? Well, Judge, there's a fundamental question in this case as to whether DCFS actually can assume guardianship of a child when there is a fit, willing, and able parent who wants the services that are being offered. And that's our position. The answer to that is no. We have found no authority, Your Honor, to say that it's acceptable whenever the child has a problem in the home, albeit a serious problem, that we take custody from parents. That leaves the child completely unprotected. Let me ask you this. Is there, in fact, a different treatment of those parents that are adoptive parents and those parents that have children born to them? I would say absolutely not. And, in fact, in this case, the system itself had promised Rico permanency. And that's what the system took from him. I mean, his best interest in being in a family. But let's look at that dichotomy between natural-born children and adoptive kids. The kids come from the DCFS guardianship. They are not, it's not as if the involvement of DCFS arises from that point of a problem. They've been, Rico has been under DCFS supervision for a long time. And to that extent, maybe there is a difference, and maybe. Judge, I think that would be very problematic as a matter of policy to say that there is some level of, higher level of intrusion into the family that's an adoptive family where they came from DCFS. And, Judge, there were services. That's the difference, is that there were services that were being offered through the post-adoption. And the judge asked the question directly to Bernadine. He asked her whether her position was that all the services that had been provided up to the point of that September 27th hearing had done what everyone hoped would have done, that is correct, or assist Rico in living a fairly normal life at home. And she admitted that the services hadn't provided the relief that everyone thought they would. And then she was asked, well, what more can be done, and she says, I don't know. And the judge went so far as to say, you know, he's in the same position as Bernadine, that he's not sure that what more can be done. And so what are you saying can be done? Well, Judge, a couple of answers to that. First of all, not all the services had been attempted, and at the time of the hearing there wasn't even a report as to what the clinicians were recommending the services should be. Secondly, the fact that Bernadine can't necessarily manage all the behaviors doesn't mean that anybody else can either, and it's been well documented that he doesn't necessarily do better in a hospital setting or even in any other setting, including school. And I think the judge made clear his concern. His concern was that if Rico was at home, Bernadine could end up getting hurt, a grandmother could end up getting hurt, or Rico himself could end up getting hurt. And that's a different situation than when Rico is under supervised care in a hospital or in an appropriate agency, custody, where they're better able to deal with those situations. Well, to say that a parent doesn't deserve a chance to try to work with Nobody's saying that. I don't think. But the child is taken from her. Her decision-making rights. Well, let's find out what triggered. What are you saying that shouldn't have been done that allowed DCFS to regain guardianship of Rico? So what shouldn't have been done is that the hearing shouldn't have proceeded to become a dispositional hearing on change of guardianship. That's point number one. Well, he had, in fact, the judge had, in fact, set prior dispositional hearings. He set one in June. Then he set another disposition or permanency hearing later. I thought that's where the oh, no, in fact, the September 27th hearing, I thought came pursuant to a motion filed by Bernadine seeking return of. No, Judge. There had been a motion to close that had been previously set. Let me ask you this. Tell us how you were prejudiced by that hearing. She lost her basic right of custody. Rico did, too. He lost the right to have the custody of his parents. In having that hearing, what type of evidence was not presented? There was no evidence as to these recommendations of the hospital, first and foremost. We didn't know what Rico's condition was at the time. And that was prejudicial, was it not? I would say so. Okay. Tell us what else. We didn't have any, there was no evidence presented as to Bernadine's inability to care. There was no evidence presented as to Rico's lacking in any care. And yet she had a lawyer who proceeded to assert his own interests and his own disagreement with her position and didn't demand the proper procedure be followed. So that was definitely prejudicial because what resulted was an order that basically deprived her and Rico effectively of their relationship. It was all subject to DCFS. And how about your claim for ineffective assistance at counsel? What is that based on? It's based on three things, first, and four ethical violations, Judge. First, the fact that Mr. Rath argued against Ms. Bell's interests. He expressly said that he didn't think what she wanted was best for her and that was his opinion, not hers. And he also breached confidentiality by revealing his own conversations with her as to this matter. And he failed to take all sorts of steps that I've outlined today, including requesting a continuance so that there could be a discharge plan so that there could be a meaningful hearing on what was being recommended. Why don't you take the rest of your time and save it for rebuttal. Okay, thank you, Judge. And hear the response. Thank you. Good morning again. Assistant State's Attorney Nancy Kisicki on behalf of the people. Obviously there are two affilies here and we have decided to divide our time. I'm addressing the finding of unable and the effective assistance claim, and Ms. Agathon from the Public Guardian is planning to address the best interest ruling in the 224 order. Why don't we at least begin with your position regarding the September 27th hearing being one of a limited nature that didn't permit the judge to reach the issues that he eventually did. Is that an accurate assessment of that September 27th hearing? No. I mean, the hearing, it was set for status, I believe, and also for a hearing. Status in the context of what? Because it isn't just a status date. It is a status date in terms of how things are progressing, where the child is now, how Bernardine is doing with Rico, and the judge was intimately familiar with the entire history of the case. Right. So the hearing was set for status. That would cover, I mean, the court needed to know anything that had happened in the interim, and something very important had happened in the interim, and the judge was confronted with a difficult situation because it was hearing for the first time. It seems like, Counsel, the mother is claiming that had the judge indicated that he was proceeding under an emergency basis, that at least she would have been notified then of what could have happened as opposed to not making any such statement. Did the judge enter its subsequent orders pursuant to what he considered to be an emergency situation? Yes, he did. It was an urgent situation. What the judge heard when the case came up was that the current plan of DCFS and the plan that the mother was agreeing to was to return Rico home from the hospital with just the services that DCFS was suggesting, which everybody could tell no one was really satisfied with those services. They were the same ones that had been in place when the whole episode happened where the mother ended up drawn into this physical fight with Rico, and the police were called, and he ended up in the hospital. So the judge had all the parties in front of him. Rico was a ward of the court, and it was the judge's obligation to make sure that all of the findings and orders that were currently in effect were accurate and were in Rico's best interest. And as of that time, based on the evidence that the judge was hearing, the judge found that the mother was unable because the situation... And when you say unable, that also means unfit? No. There are three possible findings that can work toward a DCFS guardianship, unwilling, unable, and unfit, and no one is suggesting unfit. Also, the mother has taken on a difficult job with Rico, and we understand that, and it's possible that maybe nobody would be able, no individual in a home could handle Rico all the time. But still, there's a difference between being willing to take care of a minor and being able to take care of a minor. And the judge properly found, based on the evidence, that Bernadine at that time was not able to care for, protect, train, and discipline Rico. So when the mother is claiming that she was found unfit, that's not accurate as to what the trial judge actually did? Correct. The trial judge did not make a finding of unfitness, not at disposition. I don't believe at any time he made a finding of unfitness, even at the original disposition. This was a no-fault dependency case, and no-fault means just what it says. No one is suggesting fault. So now turning to Bernadine's attorney, why isn't it accurate what counsel is alleging or asserting regarding his performance on her behalf? What Mr. Rath did was he, I mean, Strickland says there are many forms of appropriate assistance in an individual case. So the path that he chose was to look at what Bernadine wanted, which was not just to have Rico home, but to have Rico home successfully, not to have things blow up again because there weren't enough services in effect. So he presented, he questioned the witnesses, and he made the arguments to suggest, number one, that to give the witnesses an opportunity to say, really everything is okay, even though there aren't very many services in place, everything is fine, this will be enough, or in the alternative, to suggest to the court and to DCFS, and the DCFS attorney who was present as well, that DCFS really needed to be offering some different services. And the fact that that trial strategy that he used didn't end up working isn't relevant for purposes of Strickland. Did Bernadine actually testify on September 27th? Yes. And she testified during the course of direct examination by her counsel? Yes, she did. And in the course of that examination, certain facts were brought up that he believed would assist her in achieving the end result that she wanted? Certain, I'm sorry, Your Honor, certain. I mean, I thought Bernadine's counsel was arguing that Mr. Rath went outside the confidence to bring up matters that shouldn't have been brought up. Well, one of, go ahead, I'm sorry. And I just wonder whether those matters came up during the course of her examination by counsel, and therefore it is a proper subject to argue to the judge. I mean, that's probably true. Some of Bernadine's testimony was she said, I want to keep custody of my son, but I know my son has problems, and I want him to get some sufficient help to be able to function normally and independently. That's on page 40. Then she says, I don't know exactly what he needs in terms of services, but therapy and medication are not correcting whatever's wrong. So his interpretation of what her objective was was a little bit broader than she's saying now. But then the trial judge also asked her questions, and that's when she said that whatever services had been rendered up to that point weren't enough. Right, correct. And the question is what more could have been done, and she didn't know. She didn't know, and no one was offering anything. And really, as you said, what was the judge supposed to do? Now, vacating the supervision order, the order placing her under the supervision of the Department of Probation, was that a necessary step before he could take the following step, which was to return Rico to the guardianship of DCFS? Yes, because the court had, in June, had made findings that the mother was willing, able, and fit and had returned Rico to Bernadine's custody under that 2-24 order. And so in order to place Rico back under DCFS guardianship, that order had to be vacated. If there aren't any further questions, then I'll let you partner. Yes, thank you. May I please the court again? My name is Jean Agathin. I'm an assistant public guardian. I'm appearing on behalf of Rico. I would like to add just a few other remarks in answer to the questions your Honor has just posed. One difficulty that the trial court faced on September 27th, if it did not proceed, is that Rico, actually the evidence was that Rico had been ready for discharge on September 15th. It was only because the DCP investigation of Ms. L. And what's DCP again? I'm sorry. I'm sorry, your Honor. DCP is the Division of Child Protection. And they came in because she declined to pick him up? No, at this point because of the incident that had occurred at the end of August. That's correct, yes. So it was still investigating it. It was ultimately unfounded because Ms. L. claimed self-defense. So, however, on September 15th when Rico. But that concerned a possible physical contact by the mother against Rico. That's correct. And that's what was unfounded. That's correct, your Honor. But the incident itself, no one denies that it occurred. No one denies that it occurred. And, in fact, Ms. L. did testify at some length about it. And so on September 27th, the court basically was faced with this testimony about a very unsafe situation that had developed in the home. But let me ask you, if he was ready for discharge on September 15th, and until September 27th he remained in the custody of Bernadine, why wasn't he discharged to Bernadine if he was ready to be discharged? Right. Well, your Honor, the evidence is that the Hartgrove Hospital wasn't going to do that while the investigation was still pending. While DCP? While DCP was still investigating this incident. And I have not been able to find the exact date that the report was unfounded in the record, but it apparently was just a day or two before the September 27th hearing. There's an underlying claim by Bernadine that the trial judge basically substituted her best interest, the best interest of Rico for her best interest as a parent to Rico and deprived her of having custody of Rico. Well, your Honor, that's what the Juvenile Court Act is all about. The Juvenile Court Act focuses on the best interest of children. That is what it's designed to do and what the trial court did in this case. No one is disputing that parents have constitutional rights. We're not claiming that Ms. L. doesn't have constitutional rights. Within the context of a child protection proceeding where Rico had been a ward of the court for about a year and a half at this point, the parents' rights are delineated and they're observed in the Juvenile Court Act. If they weren't, every single provision of the Juvenile Court Act would have been held unconstitutional at this point. So let's go to Justice Gordon's point regarding what you believe the best interests of Rico were at the time and whether or not in the judge following those best interests somehow prejudiced the mother. Well, let me address the prejudice issue first, Your Honor. Let's remember there was absolutely no unfair surprise here. Both Ms. L. and Rico and the caseworker were aware on August 30th or 31st that this incident had occurred and he had been psychiatrically hospitalized. This hearing took place nearly a month later. So all the parties were aware of what was going on. And in the interim there had been this clinical staffing, this so-called SAID, on September 15th at which Ms. L.'s attorney discussed with her the possibility and discussed with everyone that more services were needed, that it was possible that the court would find that Rico would have to come out of Ms. L.'s custody as a result of this incident. So that was almost a full two weeks before this hearing on September 27th. Let me ask you, what terrible things did this mother do to lose this child? Your Honor, nobody's claiming she did terrible things. That's not what the case is about. I understand. No one is claiming she did terrible things. But isn't the mother claiming that she was found unfit? Yes, Your Honor. She uses that word kind of loosely. As my colleague Ms. Kozicki explained at disposition, the court has to find the parent either unfit and or unwilling and or unable to parent a child. That comes from Laquita B., among other things. And did the judge limit his findings to one of those three? Yes, he did. He found Ms. L. unable, unable only. And he was at pains in the original dispositional ruling to say, this is not to say that Ms. L. is at fault, that the adjudication had been of no fault dependency. Would any reasonable parent been able? Your Honor, I think the answer to that is a reasonable parent, a parent with sufficient training and emotional resources. You mean if the parent was a psychiatrist, that would be all right? I wouldn't take it that far, Your Honor. I think well short of that. How short of that? Your Honor, more parent family therapy, parent-child therapy, more parent coaching. Your comments, though, raise the issue of what was the parent, what assistance or what resources were made available to the parent to get her to the point where you believe she could have done better with RICO than she was able to do. I don't recall very much being directed at Bernadine. And to the extent that very few resources were directed at her, I think implicit in Justice Gordon's question may be that there are some cases where very few of us, if any of us, ordinary people, lay people, can really deal with a child that comes with a great deal of problems. And it's tough to really say, you know, with a little bit more of an effort or a little more understanding or a little bit more knowledge or, you know, a little bit more effort about resources she could have done better. I'm not sure that she could have or anyone could have. Well, Your Honor, we're hopeful that, you know, the case may reach the point, it's possible I should say, where the situation is safe enough for RICO to return home. We are not saying at this point the evidence does not show that RICO should never return home. Just so it's clear, there's been no termination of any? No, and there can't be, Your Honor. The no-fault dependency adjudication finding does not provide the basis for a later termination of parental rights. All right, now try to sum up because you're out of time. Thank you, Your Honor. Essentially, the situation in the home on September 27th was unsafe. It was very unsafe. They had a dysfunctional way of relating. Mizell did not have the parenting skills that would allow her to safely and effectively parent a teen with RICO's needs. And for that reason, we ask that you affirm the dispositional order. Thank you very much. Very short rebuttal. Thank you. This case really presents an important question. Let's start with a clear understanding of what this case is about. It's about unable, Bernadine being unable to care for the child and not a declaration by the judge that she is an unfit parent. The public guardians are the ones who use the term dispositionally unfit, and they distinguish that in saying that there's no constitutional law at stake, which we totally disagree with in terms of the Supreme Court and this Illinois Supreme Court has been over and over zealous about their custodial rights of parents and saying that fit, willing, and able parents should not lose custody of the state over their objection. The case actually raises the question of whether there are children who should become legal orphans who can have no parent because of their own needs. And we say no. We also are in agreement that Bernadine was never removed as Rika's parent, and she still is his parent, and there's still that possibility down the road where they could be reunited. She was deprived of her basic custodial rights, her decision-making authority, her right to determine anything about his education. To some extent, that happens every time he's hospitalized. To a much more limited extent, and we do allow parents to make that decision sometimes. And if they can't and if they don't, then children can be involuntarily committed over the objection of their parents. But that's the process that should be applied, not to remove the custodial rights of the parents. All right, now sum up because you're past your time. Judge, the best interest factors were not looked at in this case. Riko was taken from his parent simply because they kind of threw up their hands, but without regard to his ties to his family, his needs for education, his security, and his permanency. He really was deprived of the permanency that Bernadine had been providing him since he was placed in her home. Thank you, Judge. Judge, your honors. All right. I want to thank both of you. You gave us a very interesting case, and we'll take it under advisement. Please call the next case.